[Civ. No. 2083.   Fourth Appellate District.—November 9, 1938.]

E. B. LARSON, Respondent, v. LEWIS–SIMAS–JONES COMPANY (a Partnership) et al., Appellants.

84

Sloane & Steiner and Dreher, McClellan & McCarthy for Appellants.

Hervey & Holt for Respondent.

GRIFFIN, J.—The Lewis-Simas-Jones Company, a partnership, and also the members of said partnership as individuals, appeal from a judgment for personal injuries obtained against them. The factual background, fairly stated, discloses that the appellant Lewis-Simas-Jones Company was a partnership doing a merchandising business in San Francisco, but owning a boat (Santa Cruz) suitable for tuna fishing, which was located in San Diego harbor. A group of experienced tuna

fishermen secured the boat from the owners on a profit-sharing basis to fish on the high seas for tuna. The experience of one of these fishermen, to wit, the respondent, is detailed at great length in the transcript of the evidence.

It appears that respondent and one Anton Hage were neighbors who had discussed for some time the possibility of the respondent joining in a venture pertaining to certain fishing operations. Some preliminary repairs were made on the boat before the charterers took possession. Part of the work was done by three of the twelve fishermen. The respondent was one of the three. This work was finished in January, 1937.

The evidence shows that one of the appellants, Frank J. Jones, and a Charles A. Landers decided to have repairs made upon the boat. Landers testified that during the years 1936 and 1937 he was acting as Lewis-Simas-Jones' agent in matters relating to the "Santa Cruz." While the boat was being repaired the respondent purchased such small items as he needed for the boat and charged them to the owners. Some of the work he did of his own accord and in some matters Mr. Landers, who represented the owners, gave him some instructions. After the boat was repaired it was provisioned and on January 26, 1937, an agreement entitled "Charter Party for Fishing Voyage" was made and entered into by and between Lewis-Simas-Jones Company, a partnership, as owner, and Anton Hage, E. B. Larson, the respondent, and ten others.

The principal features of the agreement may be thus summarized: (1) The owner leases and lets to the charterers the vessel named "Santa Cruz", together with tackle, gear, etc., for the term of one continuous fishing voyage not to exceed sixty-five days. (2) Charterers shall pay to the owner, as rental, 55 per cent of the net proceeds of all fish caught. (3) Operating expenses, to be deducted from the total gross proceeds in determining the amount of rent, are generally, fees for permit, ice, fuel, cost of operation, etc., excepting, however, the cost of repairs and upkeep to the machinery and hull of the boat, and premiums for insurance on the boat and its equipment, which shall be paid by the owner. (4) Charterers shall assist with their personal labor in preparing for the voyage and acknowledge that any work performed by them on the boat prior to the execution of the agreement was

done on their own account as a consideration for the execution of the agreement by the owner and not under any employment by the owner. (5) That said fishing voyage is a joint adventure of the charterers, each charterer working for himself, and none of the charterers shall be deemed under any circumstance or for any purpose to be an employee or servant of the owner or of the boat or of the other charterers. (6) That Anton Hage shall be the head and manager of said voyage, and shall have all the powers and authority, with some limitations, of a captain and master of the boat. However, he shall not be nor be deemed to be an agent or employee of the owner for any purpose. (7) Charterers are to carefully examine the boat and its tackle and equipment and satisfy themselves that they are seaworthy and in proper condition and repair, and the departure of the charterers from the port with the boat shall constitute a final and conclusive admission and stipulation on the part of the charterers that the boat, equipment, etc., are seaworthy and in proper condition and repair; and the charterers and each of them hereby assume all the risk to themselves and their property incident to the said voyage and all dangers of the sea. (8) Charles A. Landers is designated by the owner as the owner's agent in all matters pertaining to the performance of the agreement. (9) Charterers irrevocably appoint the owner their exclusive agent to sell the catch of fish, pay from the proceeds of the sale all operating expenses, pay to itself 55 per cent as rental, and pay to the charterers from the remaining 45 per cent of the net proceeds the distributive share they agreed upon. The manager is to receive one and one-half times as much as the other charterers. (10) The agreement may be renewed for additional voyage or voyages by agreement of the parties. (11) If the proceeds of the catch are insufficient to pay operating expenses, etc., the deficiency shall be cumulative and shall be paid from the proceeds of the catch of any subsequent voyage or voyages.

Among the expenses listed were bills for ammunition which were not brought to the attention of Landers until two weeks after the boat left. Landers, who remained at home, had no knowledge of the fact that a member of the crew by the name of Earl owned a gun which was aboard the vessel. Neither Landers nor the owner of the vessel had anything to do with selecting those who went on the fishing venture

and gave no directions or instructions as to where the charterers should take the vessel. Landers had nothing to do with the navigation or management or command of the boat after its departure.

The evidence discloses that while the crew were fishing on the high seas and Mr. Hage was running the boat, they came upon several schools of fish. During all of one morning they had been particularly troubled with sea lions and the gun was used to frighten them away. On this particular occasion Hage, who was standing on the bait box, discharged one shell and then reloaded the gun to fire another shot when his foot caught in some netting and he fell. In so doing the gun was discharged and the bullet pierced the left side of respondent's chest near the base of his lung, causing him considerable suffering and permanent injury to the extent that his right lung is interfered with by the effusion of blood which has increased the thickening of the pleura and practically prevented the functioning of the lower left lung.

From the facts presented the trial court found that Anton Hage was the agent and employee of appellants and was the captain and master of the "Santa Cruz" on the date of the injury described; that respondent was an employee of appellants; and that on February 20, 1937, Anton Hage, while acting as the agent and employee of appellants and while acting within the scope of his employment, did carelessly, negligently and recklessly cause the injury heretofore described, to the damage of respondent in the sum of $6,135 and costs. From this judgment the appellants have perfected their appeal.

Counsel for appellants concede for the purpose of this appeal that if, after the vessel had put out to sea, the relationship between the owner and Larson was that of employer and employee, the judgment should be affirmed.

By the terms of the written agreement alone, there remains no doubt as to the relationship of all parties and the nature of the employment, for it specifically provides that said fishing venture is a *joint enterprise* of the charterers. If this is tenable, there can be no relationship of employer and employee. The Jones Act (41 U. S. Stats. at Large, p. 1007) makes the Federal Employers' Liability Act (45 U. S. C. A., secs. 51–59) the rule of decision in actions by employees for personal injuries resulting from marine ser-

vice to their employers but the relationship of master and servant must exist. (*Pottage* v. *Luckenbach Steamship Co.*, 206 Cal. 622 [275 Pac. 410].)

Although this action revolves about a sea-going vessel and relates to an accident on the high seas, there are no peculiar maritime issues involved and the plaintiff elected to bring his action in the state court, which has undoubted jurisdiction. (Sec. 56, U. S. C. A., title 45; *Long* v. *General Petroleum Corp.*, 11 Cal. App. (2d) 708 [54 Pac. (2d) 1147].)

To support his cause of action and judgment, respondent relies upon section 688, U. S. C. A., title 46, which provides that "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common law right or remedy in cases of personal injury to railway employees shall apply; . . . "

Nowhere in the act is the word "seaman" defined. We shall inquire whether the respondent was a "seaman" within the purview of the Jones Act. If the respondent was an employee then this question has been fully discussed and decided in the case of *Domandich* v. *Doratich*, 165 Wash. 315 [5 Pac. (2d) 310], where it is held that a member of a fishing crew is a "seaman" within the meaning of the Jones Act and Federal Employers' Liability Act.

Section 55, title 45, U. S. C. A. (Railroads), provides that "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void; . . . "

The effect of this section is to make void an agreement between an employee and employer which releases the employer from any liability to the employee for its negligence. (*Rief* v. *Great Northern Ry. Co.*, (1914) 126 Minn. 430 [148 N. W. 309].) If the contract operates so as to defeat the statutory liability, it is void, regardless of the intent of the parties. (*Philadelphia etc. R. Co.* v. *Schubert*, 224 U. S. 603 [32 Sup. Ct. 589, 56 L. Ed. 911]; *McAdow* v. *Kansas City Western R. Co.*, (1917) 100 Kan. 309 [164 Pac. 177, L. R. A. 1917E, 539].)

Inquiry will first be directed to determining whether respondent's relationship to the enterprise was that of employee

or a party to a joint adventure or enterprise. ■ To create the relationship of employer and employee or master and servant, there must be an express or implied contract or acts such as will show that the parties recognize one as the employer and the other as the employee. (*Brewer* v. *Department of Labor and Industries,* 143 Wash. 49 [254 Pac. 831].) "Whether a person performing work for another is a servant or employee of that other is a question not always easy of solution, but the authorities are in accord that the test of the relationship is the right of control on the part of the employer." (*Glover* v. *Richardson & Elmer Co.,* 64 Wash. 403 [116 Pac. 861].)

■ Some of the necessary elements of a joint enterprise are (a) a community of interest in the object of the undertaking; (b) an equal right to direct and govern the conduct of each other with respect thereto; (c) share in the losses if any; (d) close and even fiduciary relationship between the parties. (*State* v. *Superior Court,* 108 Wash. 443 [184 Pac. 348]; *Pope* v. *Halpern,* 193 Cal. 168 [223 Pac. 470]; *Mountain Meadow Creameries* v. *Industrial Acc. Com.,* 25 Cal. App. (2d) 123 [76 Pac. (2d) 724].)

■ Among the necessary incidents to the relationship of employer and employee are (1) the right of immediate discharge of the employee by the employer (*Press Pub. Co.* v. *Industrial Acc. Com.,* 190 Cal. 114 [210 Pac. 820]); (2) the right of authoritative and complete control over the actions of the employee (*Western Ind. Co.* v. *Pillsbury,* 172 Cal. 807 [159 Pac. 721]); (3) the employer stands the losses, if any; and (4) the right of the employee to quit at any time.

■ Respondent claims that appellants did control the actions of respondent employee, as evidenced in the following particulars: 1. As a covenant of the lease the charterers shall leave the port of San Diego within three days from the day the boat is put in seaworthy condition and complete the voyage within sixty-five days from that date. 2. The charterers shall devote said voyage exclusively to fishing for albacore, tuna, skip-jack and any other products of the sea that may be consented to in writing by the owner, and shall not use the boat or its tackle, gear or equipment for any other purpose. 3. The charterers shall not at any time hire any persons to perform any services on or about the boat or incur any expense that may become a lien against the

boat without the consent of the owner. 4. Charterers agree with the owner that Anton Hage shall be the head and manager of the said voyage and the said fishing operations and shall have and exercise, subject to the other provisions hereof and the rights of the owner, all the powers and authority except the power and authority to bind the boat or the owner, that he would have or be entitled to exercise if he were captain and master of the boat; provided, that he shall not be or be deemed to be an agent or employee of the owner for any purpose. 5. Charterers irrevocably appoint the owner their exclusive agent to sell the catch and divide the shares. 6. The manager to receive one and one-half times as much as the other charterers. 7. Charterers shall not permit any person, other than themselves to board the boat or go on said voyage. 8. That the losses, if any, are to be deducted from the net proceeds of the future catch or catches, if any.

The question now presented is this: Are any of these covenants in said lease or charter inconsistent with the theory of joint adventure or charter party and are they consistent with the theory of employer and employee or master and servant as between appellants and the respondent? We think not.

We are of the opinion that an owner may rent his boat to a charter party under a lease or charter containing the covenants herein related and specifically provide that the relationship of employer and employee does not exist without incurring the responsibilities or acquiring the immunities of a master with respect to the person controlled. The test of control means "complete control". (*Western Ind. Co.* v. *Pillsbury, supra; Oregon Fisheries Co.* v. *Elmore Packing Co.*, 69 Or. 340 [138 Pac. 862].) It cannot be said that appellants had complete, unqualified or authoritative control over respondent so as to establish the relationship of employer and employee when respondent entered upon his duties as a charterer under the agreement which was signed and executed by him. (*Mountain Meadow Creameries* v. *Industrial Acc. Com., supra.*)

Specifically with relation to ship charters, the federal courts have frequently decided that where the intent to make a demise of the vessel is clear, that effect is not defeated by various restrictions imposed upon the charterers. For example, the owner may name the master and engineer, etc.

(*The Del Norte,* 119 Fed. 118; *The Charlotte,* 285 Fed. 84; *Hahlo* v. *Benedict,* 216 Fed. 303.) The owner may specify the route to be followed and the ports to be visited. (*The Bombay,* 38 Fed. 512; *Metropolitan S. S. Co.* v. *Pacific Alaska Nav. Co.,* 260 Fed. 973.) Rental may be provided for in the form of a share of the catch or earnings. (*The Francis J. O'Hara, Jr.,* 229 Fed. 312; *Costa* v. *Gorton-Pew Vessels Co.,* 242 Mass. 294 [136 N. E. 100].) The owner may even reserve ultimate control by provision for cancellation of the charter and retaking possession. (*Rich* v. *Jordan,* 164 Mass. 127 [41 N. E. 56]; *Oregon Fisheries Co.* v. *Elmore Packing Co., supra.*)

■ It is a well-settled rule that when the possession, command and navigation of a ship are transferred by the general owner for any purpose, the person to whom such rights have been transferred becomes owner *pro hac vice,* and not the general owner, as his principal. (*Johnson etc. Co.* v. *Goodwin,* 68 Cal. App. 363 [229 Pac. 708].)

If the charter party let the entire vessel with a transfer of its command and possession and consequent control over its navigation to the charterer, then the charterer will generally be considered as owner for the voyage or service stipulated. If the charter party let only the use of the vessel, the owner at the same time retaining its command and possession and control over its navigation, then the charterer is a mere contractor for a designated service and the duties and responsibility of the owner are not changed.

We are aware of the case cited by respondent, viz., *Domandich* v. *Doratich, supra,* wherein it was held that a member of a fishing crew was an employee and not a joint adventurer, but there the plaintiff's contract of employment was entirely informal and consisted of an inquiry made to him as to whether ''you want to fish with me'' and his answer was in the affirmative.

As we view the provisions of the charter as a whole, they are entirely inconsistent with the relationship of employer and employee, and entirely negative the existence of that complete, unqualified or authoritative control necessary to establish that relationship. This being true, the provisions of section 55, title 45, U. S. C. A., and section 688, title 46, U. S. C. A., have no application. (*Pottage* v. *Luckenbach S. S. Co, supra.*)

There is no finding by the court that the contract received in evidence was to any extent void or was made and executed for the purpose of or with the intent to exempt the owner from any liability created under the above-mentioned sections.

A finding that the respondent was an employee of appellants at the time of the injury is not sufficiently supported by the evidence and a judgment for the respondent based thereon, of necessity, must be and is reversed with instructions to enter judgment for the defendants.

Barnard, P. J., and Marks, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 5, 1939.